**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| DEIONTA PERSON, |
| *Defendant.* |

Criminal Action No. 24-14 (RDM)

## AMENDED MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Deionta Person's motion to suppress tangible evidence.  Dkt. 10.  The Court held an evidentiary hearing on the motion on April 25, 2024.  Dkt. 18 (Apr. 25, 2024 Hrg. Tr.).  Defense counsel raised arguments at that hearing that had not been raised in the briefing, prompting the Court to order supplemental briefing.  Min. Entry (Apr. 25, 2024).  On July 9, 2024, the Court heard oral argument regarding the arguments developed in that further briefing.  At that hearing, defense counsel then suggested that there was new evidence the defense wanted the Court to consider.  *See* Jul. 9, 2024 Hrg. Tr. (Rough at 54–55). The Court, accordingly, continued the evidentiary hearing on September 19, 2024.  Min. Entry (Sept. 19, 2024).

For the reasons explained below, the Court will **DENY** Defendant's motion to suppress.

## I.  BACKGROUND

On December 1, 2023, around 10:30 p.m., Metropolitan Police Department Investigators Nicholas Damron and Christina Laury were patrolling with Officer Reginald Hildebrant near the 2700 block of Douglass Place Southeast.  Dkt. 18 at 6 (Apr. 25, 2024 Hrg. Tr. at 6:4–16); *id.* at 35 (Apr. 25, 2024 Hrg. Tr. 35:6–22).  They were patrolling in an unmarked white SUV along with two other unmarked police vehicles.  *Id.* at 34 (Apr. 25, 2024 Hrg. Tr. at 34:5–8).

Investigator Laury was driving, with Investigator Damron in the passenger seat and Officer Hildebrant in the backseat. *Id.* at 35 (Apr. 25, 2024 Hrg. Tr. at 35:6–22). It was not unusual for the team to patrol that block. According to Investigator Damron, the officers "frequent that area" because they "have recovered multiple carjacked vehicles there, [executed] multiple search warrants there, [and] have recovered multiple firearms in that area." *Id.* at 6 (Apr. 25, 2024 Hrg. Tr. at 6:18–20).

Just off of the 2700 block of Douglass Place Southeast, there is a small parking lot adjacent to the street. *See* Dkt. 20-3 (Def. Ex. 3); Dkt. 20-5 (Def. Ex. 5). On the night in question, Investigator Laury pulled her vehicle into the parking lot, and one of the other unmarked vehicles followed her. Dkt. 18 at 35–36 (Apr. 25, 2024 Hrg. Tr. at 35:23–36:1). The officers were neither responding to a particular crime nor investigating a report related to that parking lot or to Person. *Id.* at 38 (Apr. 25, 2024 Hrg. Tr. at 38:8–20). The officers entered the area because they had previously "recovered multiple robbery vehicles, carjacking vehicles, [and] firearms" in "that specific parking lot," and because "that specific parking lot is a very well known place to dump stolen vehicles and robbery vehicles." *Id.* at 95 (Apr. 25, 2024 Hrg. Tr. at 95:11–15).

Upon entering the lot, the officers "observed Mr. Person[] standing outside of an Acura TL with a Virginia tag." *Id.* at 8 (Apr. 25, 2024 Hrg. Tr. at 8:22–24). The Acura's "door was open" and when Person saw the police vehicle, he "got into" the "front driver's seat." *Id.* at 8–9 (Apr. 25, 2024 Hrg. Tr. at 8:24–9:1). The engine of the Acura was not running, and the Acura's lights were not on. *Id.* at 58–59 (Apr. 25, 2024 Hrg. Tr. at 58:21–59:3). According to Laury, as the unmarked police vehicle neared Person's car, his "eyes got very wide . . . like a deer in the headlights." *Id.* at 9 (Apr. 25, 2024 Hrg. Tr. at 9:21–24); *see also id.* at 56 (Apr. 25, 2024 Hrg.

2

Tr. at 56:18–25). Laury then pulled in front of Person's car and parked, and the other unmarked

police vehicle parked directly behind her. Dkt. 18 at 60 (Apr. 25, 2024 Hrg. Tr. at 60:11–22); *id.*

at 62–63 (Apr. 25, 2024 Hrg. Tr. at 62:20–63:1).

Laury stepped out of her vehicle and walked toward Person, saying "You know your tint

is too dark right?" Gov't Ex. 12 (Laury BWC 22:39:38–39). Person replied, "Okay." *Id.*

(22:39:40). Laury turned on her flashlight, trained it at Person, and asked, "Huh?" *Id.*

(22:39:41). Person repeated, "Okay." *Id.* (22:39:42). Laury then walked directly towards

Person, around the open car door, and asked: "Do me a favor and step out of the car for me?"

Gov't Ex. 12 (Laury BWC at 22:39:43–44). Person obliged. *Id.* (22:39:45–49). At the same

time, Investigator Damron, who had walked around an adjacent vehicle, approached Person from

the rear of the car. *See id.* (22:39:41); Dkt. 18 at 27 (Apr. 25, 2024 Hrg. Tr. at 27:17–18).

Officers from the second police vehicle approached the other side of Person's car, and as Person

was getting out of the car, one of those officers opened the passenger-side door. Dkt. 18 at 70–

71 (Apr. 25, 2024 Hrg. Tr. at 70:15–71:8); Def. Ex. 11. As Person stood up, he said, "search the

car," but Damron demurred, saying "nah, we good." Gov't Ex. 12 (Laury BWC at 22:39:47–48).

As Person stepped out of the car, however, he moved in a way that suggested to the

officers that he was concealing something. Damron reported that Person "stepped out of the

vehicle in a weird, unnatural manner. He was hunched over at the waistband and did . . . like a

180" as he got out of the car. Dkt. 18 at 11 (Apr. 25, 2024 Hrg. Tr. at 11:19–21); *see also* Gov't

Ex. 12 (Laury BWC at 22:39:45–49). As Person turned, his right side came to face Damron,

who "immediately observed" "an L shape protruding out of his waistband" that appeared to be a

"large object" "consistent with that of a firearm." Dkt. 18 at 12 (Apr. 25, 2024 Hrg. Tr. 12:16–

19); *see also* Gov't Ex. 3.

The situation progressed rapidly from there.  Laury said, "Hold on, hold on," and she moved herself to face Person more directly.  Gov't Ex. 12 (Laury BWC at 22:39:45–49).  Person immediately took off, pushing past Damron and sprinting down the sidewalk.  Dkt. 18 at 13–14 (Apr. 25, 2024 Hrg. Tr. at 13:17–14:18); *see also* Gov't Ex. 4.  Damron and Laury pursued him on foot and called for backup.  Dkt. 18 at 14 (Apr. 25, 2024 Hrg. Tr. at 14:20); *see also* Gov't Ex. 12 (Laury BWC 22:39:50–40:07).  During the pursuit, Damron saw Person "fleeing down the sidewalk" in "an irregular running motion," with his right arm "clutching at an object in his front waistband" and his left arm "moving freely."  Dkt. 18 at 15 (Apr. 25, 2024 Hrg. Tr. at 15:12–15).  The officers saw Person run down the sidewalk toward the next parking lot, where he went up a small hill, "removed a black-in-color handgun with an extended magazine out of his front waistband area, jumped up and threw the firearm over the fence" with his right arm.  *Id.* at 15–16 (Apr. 25, 2024 Hrg. Tr. at 15:21–16:10); *see also* Gov't Ex. 6; Gov't Ex. 6A.; Gov't Ex. 12 (Laury BWC 22:39:50–40:07).  At that point, one of the other officers intercepted Person and detained him against the fence.  Gov't Ex. 7; Dkt. 18 at 17–18 (Apr. 25, 2024 Hrg. Tr. at 17:17–18:1).

Damron climbed the fence and located a firearm after searching the area on the other side of the fence for about one minute.  Dkt. 18 at 18 (Apr. 25, 2024 Hrg. Tr. at 18:8–23); *see also* Gov't Ex. 8.  The recovered firearm was "a Glock 30," which is a "45-caliber firearm."  Dkt. 18 at 20 (Apr. 25, 2024 Hrg. Tr. at 20:1–3).  It had "one round in the chamber" and "25 [rounds] in the magazine."  *Id.* (Apr. 25, 2024 Hrg. Tr. at 19:1–3).  The serial number on the firearm had been "scratched off . . . so it couldn't be traced."  *Id.* (Apr. 25, 2024 Hrg. Tr. at 20:7–8).  Notably, the firearm had a "Glock auto switch:" an "object in between the slide of the firearm and the magazine" that turns the gun from "a semiautomatic firearm" into "a fully automatic

machine gun." *Id.* (Apr. 25, 2024 Hrg. Tr. at 20:10–19); *see also* Gov't Ex. 9.  That means that, rather than "firing the trigger one time" to "shoot one round," a person could simply "hold down the trigger" and "all 26 rounds would fire." *Id.* (Apr. 25, 2024 Hrg. Tr. at 20:17–19).  Upon recovery of the firearm, the officers placed Person under arrest.

On January 4, 2024, a grand jury indicted Person for unlawful possession of a firearm and ammunition in violation of Section 922(g)(1), Dkt. 1 at 1, which makes it "unlawful for any person" "who has been convicted in any court" of "a crime punishable by imprisonment for a term exceeding one year" "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). Person had been previously convicted of a felony in the State of Maryland, which put him within the sweep of § 922(g)(1)'s prohibition.  Dkt. 1 at 1.

On March 4, 2024, Person filed a motion to suppress tangible evidence, which is now before the Court.  Dkt. 10.  He seeks to "suppress the use as evidence at trial of all tangible objects seized" as the result of what he contends was an "unlawful warrantless seizure" that violated the Fourth Amendment.  *Id.* at 1.  Most importantly, he seeks to suppress the introduction of any evidence related to the recovered firearm.  *Id.* at 2.

## II.  ANALYSIS

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  Usually, that means that an officer needs a warrant before conducting a search or seizure.  There are several exceptions to that general rule, however, including two that are relevant here.  First, a law enforcement officer may conduct a brief investigative "*Terry* stop" consistent with the Fourth Amendment if the officer has "reasonable, articulable suspicion that

criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Second, officers may conduct a "traffic stop for a suspected violation of law" consistent with the Fourth Amendment if they have "'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Prado Navarette v. California*, 572 U.S. 393, 396 (2014)). If an officer conducts a *Terry* stop or a traffic stop without the requisite reasonable suspicion, the stop violates the Fourth Amendment, and Courts are typically required to exclude evidence acquired as a result of such a stop. *See Herring v. United States*, 555 U.S. 135, 139 (2009).

## A.    Timing of the stop

To determine whether a challenged stop was unconstitutional, the Court's "first task is to pinpoint the time of the stop." *United States v. Delaney*, 955 F.3d 1077, 1082 (D.C. Cir. 2020). "A Fourth Amendment seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority." *Id.* at 1081 (internal quotation and citations omitted). Where physical force is not used, the Court must consider whether, "in view of all the circumstances surrounding the incident," "a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). This standard "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.* "In making that determination, courts consider the totality of the circumstances, including 'whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the

officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled.'"  *Delaney*, 955 F.3d at 1081 (quoting *United States v. Castle*, 825 F.3d 625, 632–33 (D.C. Cir. 2016)).  The defendant bears the burden of proving that the acts at issue constitute a seizure.  *Id.*

Here, Person initially argued that he "was seized when the officers directed him to step out of the . . . car and he complied," Dkt. 10 at 4, and the government agreed, *see* Jul. 9, 2024 Hrg. Tr. (Rough at 29).  In his supplemental briefing, however, Person changed tack and now argues that he was seized "the moment Officer Laury parked only a few feet in front of his vehicle and completely blocked the car's egress."  Dkt. 19 at 12–13.

It is a close question whether the officers seized Person the moment they pulled their vehicles in front of the Acura or not until Laury approached Person and asked that he step out of the car.  "By itself, the presence of a police car is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave."  *United States v. Goddard*, 491 F.3d 457, 461 (D.C. Cir. 2007).  "'[A]dditional circumstances' can," however, "transform an otherwise consensual police-citizen encounter into a stop."  *Delaney*, 955 F.3d at 1082 (citing *Goddard*, 491 F.3d at 462).  Of particular significance here, in *United States v. Delaney*, 955 F.3d 1077 (D.C. Cir. 2020), the D.C. Circuit held that police had put on a sufficient "show of authority" to constitute a seizure when they parked their car approximately three feet away from a defendant sitting in the driver's seat of his parked vehicle in a dimly lit, narrow parking lot and shined their "take-down light" at him.  *Id.* at 1080, 1082–83.

As in *Delaney*, the officers in this case parked their vehicles in front of the Acura in a manner that would have prevented the car from leaving the parking lot.  But this case differs from *Delaney* in other important respects, leaving the Court persuaded that, here, the seizure did

not occur until a few moments later, when Laury approached Person and said, "Do me a favor and step out of the car for me." Although close in time, the Court is persuaded that the officers did not demonstrate a "show of authority" sufficient to make a reasonable, innocent person feel as though he were unfree to leave until Laury approached Person.

*First*, when the police vehicles entered the parking lot, and when the officers first saw Person, he was standing outside the vehicle. Dkt. 18 at 97 (Apr. 25, 2024 Hrg. Tr. at 97:3–6). At that point in time, even though the police vehicles were blocking the Acura from leaving, Person was not in the car, and he was free to walk away. The officers did not direct Person to enter the car; rather, he entered the car "on his own." *Id.* (Apr. 25, 2024 Hrg. Tr. at 97:7–10). Even after Person entered the Acura—and before Laury approached him—nothing initially impeded him from standing back up and walking away. The *Delaney* court distinguished other cases holding that no stop had occurred because the officers had not impeded the defendant's movement. *See Delaney*, 955 F.3d at 1083 (citing *Goddard*, 491 F.3d at 461 (no stop when officers parked fifteen to twenty feet away from a group of men on foot)); *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000) (no stop when an officer parked twenty-five feet away from the accused's car)). Here, as in those cases, nothing impeded Person from leaving before Laury approached him.

*Second*, the officers did not employ take-down lights. Dkt. 18 at 97 (Apr. 25, 2024 Hrg. Tr. at 97:11–20). Both Laury and Damron did have flashlights that they trained on Person. *Id.* at 65–66 (Apr. 25, 2024 Hrg. Tr. at 65:4–66:11). But Laury did not use her flashlight until after she had asked Person about his tint and he had replied, "Okay," which was just before she asked him to step out of the car. Gov't Ex. 12 (Laury BWC 22:39:40–41). Damron turned on his

flashlight a second later. *Id.* (22:39:42). Neither employed the flashlight in an intimidating manner.

*Third*, in *Delaney*, there were "gunshots sounding all around," which added to the context in which a reasonable person would have expected officers to object to an attempt to leave. 955 F.3d at 1084. Here, there were no such circumstances.

Thus, although this case bears some similarities to *Delaney*, the first few seconds of the interaction bear a closer resemblance to a routine exploratory approach of a police officer—an approach that does not constitute a seizure under the Fourth Amendment. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions."). It was not until Laury shined her flashlight at Person and asked him to step out of the car that the encounter "evolve[d]" or "ripen[ed]," *United States v. Mabry*, 997 F.3d 1239, 1244 (D.C. Cir. 2021)), into a show of authority that indicated compliance was required and that Person was not free to leave.

The Court must also "determine at what moment [Person] submitted to that show of authority." *Delaney*, 955 F.3d at 1084. Here, that step is clear: Person complied with Laury's directive to step out of the car, submitting (at least momentarily) to her show of authority. Gov't Ex. 12 (Laury BWC at 22:39:45–49). The Court, accordingly, finds that Person was seized when Laury approached the driver's side door of the Acura and asked him to get out of the car.

Before turning to reasonable suspicion, the Court pauses to discuss an oddity presented by the rapid sequence of events. As noted above, because Person was standing outside the car when the officers pulled into the parking lot, the fact the police vehicles blocked the Acura from leaving would not have prevented Person from leaving on foot. Person, however, entered the car shortly upon seeing the police cars. And so, by the time the seizure occurred the relevant show

of force included not only Laury's approach from the front and her request that Person step out of the car, Damron's approach from behind, and the other officers approaching from the passenger side, but also the two unmarked vehicles blocking the egress of the Acura. Thus, although Person remained free to leave when the police vehicles *initially* blocked the Acura's egress, just *moments later*—after Person entered the car and after Laury approached him—the presence of the police vehicles contributed to his seizure. That is, at the time of the seizure, law enforcement had prevented him from walking away *and* from closing the door of the car (in which he then sat) and driving away.

## B.    Reasonable, articulable suspicion

The Court must next determine whether, at the moment of the seizure, the officers had a reasonable, articulable suspicion that the defendant's vehicle was in violation of the D.C. window-tint law, D.C. Code § 50-2207.02(a)(1)(A).[1]  Person has not argued—either in his original motion, Dkt. 10, or in his supplemental briefing, Dkt. 19—that the officers lacked a reasonable suspicion or probable cause to stop him after Damron saw the L-shaped bulge in his jacket and Person pushed Damron aside to flee down the sidewalk. (Nor could he plausibly do so, since the body-worn camera footage clearly depicts that L-shaped bulge of a handgun.)

Person, instead, focuses on the stop before Person pushed Damron aside and fled. According to Person, the officers lacked a reasonable articulable suspicion that Person was violating the D.C. tint laws when Laury asked him to step out of the car for two reasons:

---

[1] The government also argues that there was reasonable suspicion that Person had violated subsection (g) of the tint law, which prohibits a person from installing window tinting in the District of Columbia. *See* Dkt. 21 at 17; D.C. Code § 50-2207.02(g). Because the Court concludes that there was an objective, reasonable basis to stop Person for a violation of subsection (a)(1)(A), the Court need not decide whether subsection (g) provided an independent basis for a *Terry* or traffic stop.

(1) because the officers did not have an objectively reasonable basis for determining that the window tint was too dark and (2) because the car that Person was sitting in was parked in a private lot.  Dkt. 10 at 4; Dkt. 19 at 18–19.  The Court takes each argument in turn.

  1. *Window tint*

  Under D.C. Code Section 50-2207.02, "no motor vehicle, other than a mini-van, may be operated or parked upon the public streets or spaces of the District of Columbia" if it has a "front windshield or front side windows that allow less than 70% light transmittance," § 50-2207.02(a)(1)(A), other than in the top five inches of the windshield, § 50-2207.02(b).  In other words, "70 percent of the light that would normally pass through has to be able to pass through," meaning the windshield and windows can only be "30 percent tint[ed]."  Dkt. 18 at 10 (Apr. 25, 2024 Hrg. Tr. at 10:12–16).  According to Damron, that standard permits only a "very, very light" tint, *id.* at 23 (Apr. 25, 2024 Hrg. Tr. at 23:21), "pretty much like not having tint at all," *id.* at 26 (Apr. 25, 2024 Hrg. Tr. at 26:4–5).  He testified that a window can exceed the tint limit even when it does not resemble "blackout glass" and that, even when a car's windows are tinted beyond the legal limit, it is still possible to "see into the car."  Dkt. 18 at 91 (Apr. 25, 2024 Hrg. Tr. at 91:14–18).

  The Court is persuaded that the officers had a reasonable basis for concluding that Person's windows exceed the tint limit.  Officers need not conduct a tint reading before stopping a car for a tint violation.  *See* Dkt. 12 at 10 (collecting cases).  An officer need only have an objectively reasonable suspicion that the window is tinted darker than the law permits; the officer is not required to confirm that suspicion with a measurement before conducting a stop.  *See United States v. Garcia*, 279 F. Supp. 2d 294, 299 (S.D.N.Y. 2003).  At the evidentiary hearing, Damron explained how he and other officers on site concluded that Person's window had more

than a 30% tint.  He testified that he has participated in "hundreds of tint violation stops" and has "seen investigators and other members measure tint before" on myriad occasions.  *Id.* at 23 (Apr. 25, 2024 Hrg. Tr. at 23:18–19).  Damron further explained that he did not need a tint measurer to "immediately recognize" that the Acura was tinted "darker than the DC local standard."  *Id.* (23:22–23).  The Court's review of the body-worn camera footage, moreover, confirms Damron's testimony; it is clear from the video that the windows were darkly tinted.

Based on the Court's assessment of Damron's testimony—and, more definitively, based on the Court's own review of the body-worn camera footage—the Court finds that the officers had an objectively reasonable basis to suspect that the Acura's windows were tinted darker than permitted under D.C. law.  *See generally* Dkt. 18; *see also* Gov't Ex. 2A; Gov't Ex. 2B.

2.     *Private lot*

The next question is whether the officers had an objectively reasonable basis for suspecting not only that Person's tint was darker than that allowed under D.C. law, but also that Person had violated—or was about to violate—§ 50-2207.02(a)(1)(A), which makes it unlawful to "operate[] or park[]" a car with that level of tint "*upon the public streets or spaces* of the District of Columbia."  *Id.* (emphasis added).

Person argues that, by its language, the D.C. tint statute "does not prohibit tinted windows on vehicles that are parked on *private* property."  Dkt. 19 at 19.  The record is clear that the parking lot at issue is, in fact, owned by a private company.  *See* Sept. 19, 2024 Hrg. Tr. (Rough at 31).  According to Person, that means that he could not possibly have been in violation of the tint law and that the officers' alleged basis for the stop was "based entirely on *lawful conduct* that could only have been reasonably interpreted as *lawful conduct*."  Dkt. 19 at 20 (emphasis in original).

**a.**

Before considering the merits of this argument, the Court must first determine whether it was waived.  In particular, the government contends that the defense waived this argument by failing to raise it in briefing prior to the initial suppression hearing.  Dkt. 21 at 6.  Although the Court agrees that the defense strategically hid the ball before the initial hearing and thereby delayed proceedings, the Court is unpersuaded that the defense waived the argument.

Person's original motion argued only that "Person was not acting in violation" of the D.C. tint law and that "the police did not have probable cause or a reasonable articulable suspicion to believe he was."  Dkt. 10 at 5.  The motion made no mention of the requirement that the violation occur "upon the public streets or spaces of the District of Columbia," nor did it argue that an ungated, residential parking lot that is immediately adjacent to a public street is not a "public space."  Moreover, after the government filed its opposition, which focused on whether officers had a reasonable, articulable suspicion that the windows of the Acura were tinted darker than the limit, the defense opted not to file a reply brief.  Instead, the defense waited until after the government offered its evidence at the suppression hearing to argue that the officers could not have reasonably suspected Person of violating § 50-2207.02, not only because they had no way to tell whether the tint was too dark, but also because the law does not apply to a vehicle parked in a privately-owned parking lot.  Dkt. 18 at 113 (Apr. 25, 2024 Hrg. Tr. at 113:13–15).

At the end of first day of the evidentiary hearing, the defense conceded that it had strategically held its fire; it did so, in counsel's words, because she "know[s] what happens when you lay it all out for the government and these officers."  *See id.* at 113 (Apr. 25, 2024 Hrg. Tr. at 113:16–22).  Having kept her powder dry, defense counsel further conceded that the issue "ha[d]n't been briefed" and only then requested "a chance to brief it."  *Id.* (Apr. 25, 2024 Hrg.

Tr. at 113:3, 113:23–114:1). The defense's decision to delay revealing the nature of its argument was not conducive to the orderly and efficient administration of justice; it has unnecessarily delayed the resolution of the pending motion, it has required additional briefing, and it has required additional factual presentations by both sides. Under these circumstances, the Court could have declined to permit the defense to submit further briefing and evidence, and it only allowed these further submissions and testimony out of deference for the rights of the accused. The Court is unpersuaded, however, that the defense waived the argument.

As the defense points out, Dkt. 22-1 at 3–4, the cases cited by the government are inapposite. Person timely filed his suppression motion, and he neither waited to make this argument until the eve of trial nor violated any of the Court's deadlines or orders. This distinguishes his case from many of the cases cited by the government. *See* Dkt. 21 at 6–7 (citing *United States v. Sobin*, 56 F.3d 1423, 1427 (D.C. Cir. 1995); *United States v. Mangieri*, 694 F.2d 1270, 1282–83 (D.C. Cir. 1982); *United States v. Torres*, 908 F.2d 1417, 1424 (9th Cir. 1990); *United States v. Mancillas*, 183 F.3d 682, 703 (7th Cir. 1999), *United States v. Knezek*, 964 F.2d 394, 397–99 (5th Cir. 1992); *United States v. Bullock*, 590 F.2d 117, 120 (5th Cir. 1979)). Moreover, although the original motion to suppress was "sparse" and "boilerplate," it did (albeit vaguely and without legal analysis) raise the question of whether the officers had a reasonable suspicion that Person had violated the tint law. *See* Dkt. 10 at 4–5. The government bears the burden of "provid[ing] evidence sufficient to support reasonable suspicion justifying" the stop, *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016), and the defense is not precluded from developing its arguments in response to the evidence or lack of evidence presented at the suppression hearing.

The government also argues that "'[i]t is defense counsel's job to develop suppression arguments in a meaningful way so that the government has an adequate opportunity to respond and the district court to make an informed decision,'" Dkt. 21 at 8 (quoting *United States v. Pope*, 467 F.3d 912, 919 (5th Cir. 2006)).  The cases supporting that proposition, however, permit defense counsel to develop suppression arguments "in [the] motion to suppress *or at the suppression hearing*" and prohibit defense counsel only from raising such claims "for the first time on appeal."  *Pope*, 467 F.3d at 918 (emphasis added).  Here, the Court has ensured that the government has had an adequate opportunity to respond both legally and factually to the arguments (both in written submissions and during the second day of the suppression hearing) and has suffered no lasting prejudice.

The Court will, accordingly, reach the merits of the argument.

**b.**

Whether a *Terry* stop is supported by reasonable, articulable suspicion is an objective standard.  *See Ornelas v. United States*, 517 U.S. 690, 696 (1996).  "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion."  *Id.* at 696.  The evidence that gives rise to suspicion must be "taken as a whole" and "viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."  *United States v. Clark*, 24 F.3d 299, 295–96 (D.C. Cir. 1994).  Here, there are two possible paths of inferences by which a reasonable and cautious police officer could have developed a reasonable, articulable suspicion that would support a *Terry* stop.

**i.**

First, the Court must consider whether a reasonable officer would have suspected that Person was about to drive the Acura onto the public street.  Person's arguments focus primarily on whether Person's car was in violation of the D.C. tint law at the time of the stop.  But an investigatory stop can be justified "by some objective manifestation that the person stopped is, *or is about to be*, engaged in criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417 (1981) (emphasis added).  Here, even accepting (for now) Person's argument that a car must be on a publicly-owned road or space to violate the law, the facts known to the officers at the time at least arguably establish a reasonable basis to conclude that Person was about to drive onto the 2700 block of Douglass Place.  When the officers entered the parking lot from Douglass Place, Person "immediately jumped back into the driver's seat of the vehicle."  Sept. 19, 2024 Hrg. Tr. (Rough at 7).  And the only egress from the parking lot was onto Douglass Place, which was immediately adjacent to the parking lot.  *See id.* (Rough at 7–8).  Damron testified that he was concerned "that . . . Person was going to flee in the vehicle," and the only place for him to go was onto the public street.  *Id.* (Rough at 7).  That belief was based on Damron's experience encountering "hundreds of people" who would "see [law enforcement officers], jump into the driver's seat of the vehicle[,] and flee."  *Id.* (Rough at 8).  Person was sitting (as far as the officers could see) in the driver's seat of the car, and the public roadway was just steps away.  Notably, moreover, Person was alone in the car—he was not socializing with others—nor was he cleaning the car, making a repair, or unloading groceries or any other goods.

According to the defense, these circumstances fail to support a reasonable suspicion that Person was about to drive the Acura on the public roadway.  At the evidentiary hearing, the defense pointed out that Person's foot remained outside of the car throughout the encounter, that

the car door remained open, and that he never inserted the keys into the car nor started the ignition. *Id.* (Rough at 19, 27). The defense is correct that the officers could see that the car door was open before Laury effected the seizure. But the door obscured Person's leg as Laury approached the car, and it was not until she rounded the door and turned on her flashlight that she could have seen that his left leg was outside the car. Darmon testified, moreover, that "when [he] walked up [Person] was in the driver's seat" and Darmon "did not see his leg out of the vehicle." *Id.* (Rough at 21) (Damron). But, more importantly, even if the officers saw that Person's left leg was outside the car as Laury was directing him to step out, that would not itself undermine the officer's suspicion that Person was about to leave the parking lot (and thus to drive on the public street). A *Terry* or traffic stop does not require certainty. All that would be required here is a reasonable suspicion that Person was about to drive off in violation of the tint law.

At some level of temporal or spatial remoteness, of course, it is unreasonable to conclude that a potential crime (or violation) is "about to" take place. Here, plausible arguments can be made on either side of the divide. On the one hand, Person opened the car door and sat in the driver's seat; the car was just a short distance from the adjacent public street and was facing forward in the parking space; and the only place to go was onto the public street that runs adjacent to the parking lot. On the other hand, it is possible that Person sat in the driver's seat for other reasons. Perhaps he was retrieving something from the car, or perhaps he was avoiding the police officers who had just entered the parking lot (as was his right). Notably, reasonable suspicion "need not rule out the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also Navarette v. California*, 572 U.S. 393, 403 (2014), but it requires more than hunch or intuition.

Person premises his contention that a reasonable officer could not have suspected that he was about to drive away on the fact that they "never observed the vehicle running," "they never observed the vehicle's lights on," and "they never saw [Person] with a key in his hand." Dkt. 24 at 2. Permitting the police to conduct an investigative stop under these circumstances, he posits, threatens to open door to a "virtually . . . limit[less] . . . ability [of the police] to conduct pretextual stops." *Id.* at 4. Members of the public would risk seizure, for example, even if their "vehicle [is] parked on their private property, regardless of whether they opened the driver's door or partially sat in the driver's seat—for example, to retrieve something from their glove box." *Id.* For support, Person points to *United States v. Brooks*, 679 F. Supp. 3d 225, 235–36 (D. Md. 2023), a decision from the U.S. District Court for the District of Maryland, granting a motion to suppress evidence obtained during an investigative stop—which, like this case, was premised in a tint violation—of an individual parked in parking lot at a private apartment complex. But the differences between that case and this one are as illuminating as the similarities. For one thing, the *Brooks* court noted that, under Maryland law, the officer must "'observe' that the vehicle is being operated on a highway in violation of the law in order to have authorization to stop that vehicle." *Id.* at 235 (citing Md. Code. Ann. Transp. § 22-4-6(i)(2)). Here, Person fails to identify any analogue under D.C. law. And, in *Brooks*, "[e]ven if the vehicle was driven out of the parking lot, it still would have had to be driven down the private road some distance before reaching . . . a public highway." *Id.* Here, in contrast, the parking lot was immediately adjacent to Douglass Place, and there was nowhere to go other than Douglass Place.

Person relies most substantially on the following passage from the *Brooks* decision:

Although the Government has identified several cases in which the court found reasonable suspicion of a moving violation when the officers did not observe the

individual actually driving on a public highway, those stops occurred on or immediately adjacent to a public road where the car necessarily must have been driven on the public road shortly before the stop, not in a private residential parking lot located on a private road, and there were additional indicia that the individual was operating the vehicle, such as the fact that the engine was running. *See United States v. Junkins*, 860 F. App'x 297, 303 (4th Cir. 2021) (finding that, although officers did not observe the defendant operating the vehicle, they had reasonable suspicion to stop the defendant for an expired registration where the car was parked in the parking lot of a convenience store on a public highway and the vehicle's engine was running); *United States v. Stewart*, 149 F. Supp. 2d 236, 241–43 & n.15 (E.D. Va. 2001) (finding that officers had reasonable suspicion to stop an individual for violating state window tinting laws in the parking lot of a public library because the lot could be considered a public highway under Virginia law, the officers had seen the defendant driving the car in the parking lot, and the vehicle's engine was still running); *Williams*, 2019 WL 4415540, at *8 (finding that officers had reasonable suspicion to stop the defendant for defective tail lights where the stop occurred as the defendant was driving the car on a private road that led to a public road). Accordingly, the Court finds that, where the state statute prohibited operating a vehicle on a highway with certain window tint levels, the officers did not have reasonable suspicion to support a traffic stop where they encountered the Accord parked in a private residential parking lot located on a private road, particularly when they did not observe it in operation and the engine was not running. *See Sanders*, 954 F.2d at 229–30. *Cf. United States v. Gore*, No. RBH-12-0057, 2012 WL 1621007, at *2 (D.S.C. May 9, 2012) (finding that a law enforcement officer did not have reasonable suspicion to stop the defendant for a suspected violation of a traffic law barring the parking of unattended cars on a public highway where the officer observed the defendant park his unattended car in a private parking lot).

679 F. Supp. 3d at 235–36. For the most part, the Court agrees with that analysis. Here, however, Person's vehicle was parked in area "immediately adjacent to a public road" and there were other "additional indicia" that Person was about to operate the vehicle—namely, the absence of any signs that he was in the car for other reasons. *Id.* To be sure, the engine was not running and the lights were not on. But reasonable suspicion is necessarily a fact-intensive inquiry, which is not suited to categorical rules (*e.g.*, was the engine on or off?). And, here, other circumstances—including the officers observing Person entering the car, the absence of any evidence that he entered the car from other reasons (such as to retrieve something or to

socialize with others), officer's Damron's experience, and the proximity to the adjacent roadway—could support a reasonable inference that Person would have driven away.[2]  *See Terry*, 392 U.S. at 27.

The Court is also skeptical that upholding the stop at issue here will leave residents of the District of Columbia at risk that the police will stop them "on their private property" anytime that they sit in the driver's seat of a car, for example, "to retrieve something from their glove box." Dkt. 24 at 4.  Each case must be decided on its facts, and this case bears little resemblance to the type of abuses that the defense hypothesizes.  At the very least, officers are limited by whether they would have authority, without a warrant or probable cause, to enter an individual's property to determine whether a traffic violation is about to occur.  Here, Person cannot—and does not— claim that he would have standing to contest the authority of the officers to enter the parking lot, in which he himself was just a visitor.  A private driveway presents a different story.  The fact that this is a close case, moreover, does not mean that a decision in the government's favor would open the door to *Terry* stops under other, less convincing circumstances.

---

[2] The government also suggests that the officers had reason to believe Person had *previously* "used" the public street to enter the parking lot because the car "would necessarily had to have come from the public street." Dkt. 23 at 1.  Although law enforcement officers are permitted to conduct *Terry* stops based on "reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony," *United States v. Hensley*, 469 U.S. 221, 229 (1985), it is unsettled whether they are permitted to conduct such a *Terry* stop when the past crime suspected is only a misdemeanor, or, as here, a mere infraction, *see id.* ("We need not and do not decide today whether *Terry* stops to investigate all past crimes, however serious, are permitted.").  The D.C. Circuit has yet to weigh in on this question, and the circuits that have done so have held either that stops based on suspected past misdemeanors are not permissible or that they are permissible only when the public's interest in the stop outweighs the individual's interest in privacy—often when the misdemeanor at issue is one that involves a threat to public safety.  *See United States v. Hughes*, 517 F.3d 1013, 1017 (8th Cir. 2008) (collecting cases).  Here, the Court is doubtful that a backward-looking suspicion of a previous tint law violation, which does not even rise to the level of misdemeanor, could justify a *Terry* stop.  But the Court need not decide the issue because it concludes that the search was justified on other grounds.

Finally, the defense correctly notes that the government failed to raise this argument until after the second hearing and that the government's filing went "beyond the Court's order" directing "the government to provide" certain record citations.  Dkt. 24 at 1.  Much of what the Court has to say above regarding the delay and inefficiency that results when arguments are raised late in the process applies here as well; the government could have raised this argument earlier, and the orderly resolution of motions requires the parties to adhere to the Court's orders and schedule.  That obligation applies with particular force, moreover, when the government brings criminal charges against an individual.  As with the defense's request for supplemental briefing (and to continue the suppression hearing) discussed above, however, the Court will permit the government's argument to stand because the defense has had ample opportunity to respond—and, indeed, offered a detailed factual and legal response to the argument.

As the above discussion reflects, this is a close case.  Some of the relevant circumstances support the government, and others support the defense.  On the one hand, it is often a reasonable inference that, when someone enters the driver's side of a car without any other evident purpose, he intends to drive away, and, here, the roadway was just steps away.  On the other hand, the officers did not wait to see whether Person would start the engine and turn the lights on, which would certainly have confirmed his intention to drive away.  And, as explained above, this case is complicated by the fact that, although the seizure did not occur until Laury approached Person, the police vehicles blocked the Acura from leaving, even before Person entered the car.  Although the defense does not make this point, one might argue that it would have made little sense for him to enter the car with the intention of promptly driving away, when he could not have done so, given the location of the police vehicles.

Because this is such a close question, and because—as discussed below—the Court concludes that the government's alternative (and more developed) theory supports the decision to conduct an investigative stop, the Court will leave this question unresolved. Suffice it to say that the government's theory is not without significant legal and factual support, but nor is the defense's counterargument.

**ii.**

Turning to that alternative theory, the Court is persuaded that an officer could have reasonably concluded that the parking lot in which the Acura was parked was a "public space" within the meaning of the D.C. tint law. This conclusion rests on both a potential mistake of fact and a potential mistake of law. To be clear, the Court has not concluded—and need not decide— that the officers made *any* mistake of law or fact. What matters for present purpose is that—*at the very least*—any such "mistakes" would have been reasonable; that is, the officers at the scene could reasonably have suspected that Person was in violation of the D.C. tint law based on the totality of the circumstances. *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014) (recognizing that reasonable suspicion can arise even when an officer is mistaken as to a fact or the law, so long as any mistake is reasonable).

Start with the potential mistake of law. The D.C. tint law provides, in relevant part, that "no motor vehicle, other than a mini-van, may be operated or parked upon the public streets or spaces of the District of Columbia with . . . [a] front windshield or front side windows that allow less than 70% light transmittance." D.C. Code § 50-2207.02(a)(1)(A). The parties disagree about the meaning of the phrase "upon the public streets or spaces of the District of Columbia." According to the defense, only "spaces" that are *publicly owned* constitute "public spaces" for purposes of the D.C. tint law. *See* Dkt. 24 at 5 n.4. The government disagrees. On its view,

"spaces"—whether privately or publicly owned—constitute "public spaces" for purposes of the

D.C. tint law if they are generally *open to the public*.  Dkt. 21 at 10.

The statute does not provide a clear answer.  The governing statute does not define

"public" or "public streets or spaces."  *See* D.C. Code § 50-2201.02.  It does, however, define

"[p]ark" to mean "to leave any motor vehicle standing on a highway, whether or not attended."

D.C. Code § 50-2201.02(12).  And it defines "[h]ighway," in turn, to mean "any *street*, road, or

public thoroughfare, or the entire width between the boundary lines of every publicly *or

privately* maintained way, *when any part thereof is open to the use of the public for purposes of

vehicular or pedestrian travel*."  D.C. Code § 50-2201.02(7) (emphasis added).  The statute,

accordingly, seems to contemplate that parking restrictions may apply not only to publicly

maintained ways—including "streets"—but also to privately maintained ways that are "open to

the use of the public for purposes of vehicular or pedestrian travel."  *Id.*  The tint law, however,

applies only to vehicles operated or parked on "*public* streets or spaces."  D.C. Code. § 50-22-

7.02(A)(1) (emphasis added).  Thus, although the statutory definitions at least hint at the

conclusion that a highway—and thus a "street"—includes a privately maintained "way" that is

"open to the use of the public," it is at least possible that the D.C. Council intended to distinguish

between "streets" that are "open to the use of the public" and "public streets and spaces," which

are both open to the public *and* are publicly owned or maintained.  Nor does the statute offer any

definition of the word "spaces" or the phrase "public . . . spaces," although it seems safe to

conclude that a "public space"—where a vehicle might be operated or parked—means something

other than a street.

Other chapters of the D.C. Code do provide definitions for "public space" as "the

property owned or under the jurisdiction of the District of Columbia," *see* D.C. Code § 50-

2421.02(9), or as "all the publicly owned property between the property lines on a street," *see* D.C. Code § 10–1101.01(6).  But none of those definitions apply to the D.C. tint law, and those definitions present their own challenges, which lie beyond the scope of this decision.  They also serve purposes that differ from the tint law.

The D.C. Court of Appeals has explained that "[i]f a word that should be defined in a statute is not, then its commonly accepted meaning is applied."  *Campbell v. United States*, 163 A.3d 790, 795 (D.C. 2017) (internal quotation marks and citation omitted).  But the word "public" has several meanings.  It can mean "of or relating to a government."  Merriam-Webster Online, *Public* (adj.) 2(b).  But it can also mean "of, by, for, or directed to" "the people as a whole."  Merriam-Webster Online, *Public* (adj.) 3(b) (cross-referencing *Public* (noun) 2).  It is not difficult to identify cases that use the word in either of these manners.  The D.C. Circuit, for example, has sometimes used the word in the first sense and sometimes in the second.  *Compare Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 399 (D.C. Cir. 2017) (using the terms "public lamppost" and "publicly owned lamppost" interchangeably), *with United States v. Allen*, 629 F.2d 51, 55–56 (D.C. Cir. 1980) (describing a privately owned establishment open to the public as "a public place"); *cf. PruneYard Shopping Center v. Robins*, 447 U.S. 74, 88 (1980) (recognizing state-law petition rights could apply in a privately owned shopping center open to the public).  Both sides marshal cases from D.C. and elsewhere in support of their respective positions.  *See* Dkt. 19 at 24–26 (defense); Dkt. 21 at 10–11 (government).

Neither side, however, has provided the Court with caselaw interpreting the phrase "public streets or spaces" as used in the D.C. tint law—and, indeed, most of the case law that the parties invoke deals with language that differs in material respects.  Person points out that

"numerous courts" faced with officers mistaken about the reach of various state tint laws "have

suppressed evidence." Dkt. 19 at 20. But the cases cited by the defense involved police

mistakes that were unreasonable. Among other cases, the defense invokes the *Brooks* case,

which is discussed above, 679 F. Supp. 3d 225. But the Maryland statute at issue in that case

prohibited "operat[ing] a vehicle" registered "on a highway," Md. Code Ann., Transp. § 22-

406(i)(1)(i), and the *Brooks* court concluded that sitting in a vehicle in a private parking lot

located "some distance" from a highway did not constitute operating the vehicle on the highway,

*id.* at 234–35. The D.C. law, in contrast, applies to vehicles operated or "parked" on a public

street or in a "public . . . space." D.C. Code § 50-2207.02(a)(1)(A).

The same goes for *United States v. Johnson*, 256 F.3d 214 (4th Cir. 2001), which the

defense also invokes. The South Carolina tint statute at issue in that case applied only to cars

that were "required to be registered" in South Carolina. *Id.* at 216. And so an officer who pulled

over a car with Georgia plates based on a tint violation (without any reason to believe that the car

was improperly registered) could not have had a "reasonable suspicion" that such a violation was

occurring. *Id.* at 217. That reasoning has little relevance here.

It is equally possible to find cases that support the government's position that the

officers' interpretation of the phrase "public spaces" was reasonable, although those cases also

turn on the unique statutory text that governs under state law. In *United States v. Diaz*, 854 F.3d

197 (2d Cir. 2017), for example, an officer stopped the defendant in the stairwell of a private

apartment building for violating New York's open container law, which prohibits drinking or

consuming alcoholic beverages "in any public place." *Id.* at 203. That law, unlike the tint law at

issue here, provided a definition of "public place:" a "place to which the public or a substantial

group of persons has access, including, but not limited to, any highway, street, road, sidewalk,

parking area, shopping area, place of amusement, playground, park or beach located within the city." *Id.* Absent from that list was "apartment-building stairwell." The Second Circuit concluded, however, that its role was not to determine the scope of the law, but rather to assess only whether the officer's belief that the law applied to common areas of apartments was "objectively reasonable." *Id.* In concluding that it was reasonable, the court noted that New York's lower courts had reached conflicting results, and that the New York Court of Appeals had yet to weigh in on the question. *Id.* at 204–05. It, accordingly, concluded that the officer's "belief that the apartment-building stairwell qualified as a 'public place' within the meaning of the open-container law was an objectively reasonable prediction of the scope of the law" because it was "a reasonable interpretation of an ambiguous state law, the scope of which had not yet been clarified." *Id.* at 204.

Here, there is even less for this Court (and law enforcement) to rely upon to determine whether the D.C. tint law applies only to publicly owned (or maintained) streets and spaces or whether it also applies to areas that are open to the public, including parking areas and shopping centers that the public can freely access. The law provides no definition and no helpful list of exemplars. And the Court lacks the benefit of *any* relevant D.C. case law. The Court, accordingly, concludes that because common usage supports both the defense's and the government's view (that is, the statute can be read to apply only to publicly owned streets and spaces or to all streets and spaces that the public can freely access); because the parties have failed to identify any decision of this Court, the D.C. courts, or the D.C. Circuit addressing the scope of the D.C. tint law; because they have also failed to identify any statute from any other jurisdiction that uses essentially the same language and that lacks any relevant definitions; and

because the purposes of the law do not tip decidedly in either direction, the Court is persuaded that a reasonable judge could adopt either of the proposed, conflicting interpretations.

As a result, the Court is persuaded that the officers' potential mistake here—assuming that they, in fact, made a mistake—constituted a reasonable mistake of law under *Heien v. North Carolina*, 574 U.S. 54 (2014).  As Justice Kagan elaborated in her concurring opinion, the test for a reasonable mistake of law is satisfied "when the law at issue is 'so doubtful in construction' that a reasonable judge could agree with the officer's view." *Id.* at 70 (Kagan, J., concurring) (quoting *The Friendship*, 9 F. Cas. 825, 826 (C.C.D. Mass. 1812) (Story, J.)).  This is such a case.  The statute lacks a relevant definition, a reasonable judge could read the limited text in the way the government proposes, and no existing precedent provides meaningful assistance in interpreting the text of the D.C. law (as opposed to the different text found in tint or analogous laws from other jurisdictions).

Now for the potential mistake of fact.  Was the parking lot at issue in fact "open to the public"?  Here, again, the parties disagree, and there is little precedent to guide the Court's inquiry.  Just as there are no decisions interpreting whether the D.C. tint law applies to spaces open to the public, there are no decisions interpreting what it would mean to be "open to the public" for purposes of that law.  Courts around the country have defined that concept in various ways.  In Nebraska, the phrase "open to public access" has been interpreted to mean that "the public has permission or the ability to enter." *State v. Prater*, 268 Neb. 635, 658 (2004).  Thus, even a lot with a "private parking" sign can be considered "open to public access" when there is "no indication that the public was not allowed to enter the lot or was prohibited from using the lot under any circumstances." *Id.* at 658, 660.  In Idaho, a private parking lot is "open to the public" if it is "available for vehicular travel or parking by the general public," meaning "an

indefinite and undefined group of people." *State v. Martinez-Gonzalez*, 152 Idaho 775, 784–85 (2012). When confronted with an apartment complex parking lot, courts there look at the size of the complex and the amount of control any particular tenant could exercise over the area, along with whether there were physical barriers or posted signs restricting access. *Id.* at 785.

Here, the Court heard testimony regarding the lot's private and public qualities. A 42-inch wrought iron fence bordered three sides of the parking lot. Sept. 19, 2024 Hrg. Tr. (Rough at 36). The property asset manager testified that only "residents and their guests" are permitted to park there. *Id.* (Rough at 32). Cars are occasionally towed from the lot. *Id.* (Rough at 34). On the other hand, there are no signs posted to indicate that the lot is not available for public use. *See id.* (Rough at 50). There is no gate regulating entry. *Id.* (Rough at 1). Residents are not given parking permits by which to identify their (and their guests') cars. *Id.* (Rough at 49).

For present purposes, the Court must consider the indicia and circumstances that were available to the officers on the scene; testimony about the unposted and rarely enforced policies of the company that owns the lot have little or no bearing on what a reasonable officer would have perceived. Damron testified that the lot is a "well known place to dump stolen vehicles," Dkt. 18 at 95 (Apr. 25, 2024 Hrg. Tr. at 95:13–15), which at least suggests that day-to-day access was unrestricted. There were no signs indicating that public access to the lot was forbidden or restricted in any way. Although the defense suggested at one point that the officers should have noted that the Acura had a parking permit, it later conceded that the lot required no such permits, and there is no evidence in the record that the cars in the lot had assigned spaces or that they displayed parking permits of any kind. Moreover, although the lot was once surrounded by a six-foot-tall security fence, at the time of the seizure, it was simply bordered by a short, wrought iron fence, which may have limited access from the sidewalk and adjoining properties, but that

28

posed no limitation or restriction on vehicular access.  In short, to the reasonable observer, the parking lot seemed like any parking area at an apartment complex or shopping center in which members of the general public come and go without meaningful restriction.  Viewed in that light, a reasonable officer could have easily concluded that the lot was "open to the public."

The Court, accordingly, concludes that at the time of the stop, there were sufficient indicia of public accessibility that a reasonable officer could have concluded the lot was open to the public.  With that factual understanding and understanding that a reasonable officer could have construed the statute in the manner described above, the Court is persuaded that the stop was permissible under *Terry* and its progeny.

3.  *Pretext*

Finally, Person alleges that the officers' focus on window tint was pretextual.  According to Person, the officers' conduct "demonstrates that they had no real concern about the tint" because they did not have a tint meter or a ticket writer and because after arresting Person, they "left the car in the parking lot, even though its window tint remained unchanged."  Dkt. 19 at 5, 2.  It is well settled, however, that Fourth Amendment challenges cannot be "based on the actual motivations of individual officers" and that even pretextual reasons for a stop can form a proper basis for reasonable suspicion.  *Whren v. United States*, 517 U.S. 806, 813–14 (1996).  It is not the Court's place, therefore, to delve into the officers' actual motives.  Once the Court has found that there was cause for reasonable suspicion, the inquiry is over, the stop is consistent with the Fourth Amendment, and any evidence gathered from it need not be suppressed.

## CONCLUSION

For the foregoing reasons, the Court concludes that the officers' investigative stop on December 1, 2023, did not violate the Fourth Amendment.  Defendant's motion to suppress, Dkt. 10, is hereby **DENIED**.

**SO ORDERED**.


 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  October 28, 2024